James S. Rogers et al., Appellants, *v.* The New York and Texas Land Company et al., Respondents.

134    197|
75 AD⁴592|

Where land of great value is conveyed for no substantial consideration and yet with no intention of making a gift, the probabilities favor the existence of reserved rights in the nature of a trust, and slight evidence as to such an intent of the parties will establish one.

A railroad corporation which had outstanding about $7,000,000 of second mortgage bonds, transferred to trustees for the bondholders lands, the value of which was about the amount of the bonds; the transfer was accepted by the bondholders in full satisfaction of said bonds. A committee.was appointed by the bondholders to devise a plan for managing and disposing of the lands so as ultimately to secure to the owners the par value of the bonds; said committee recommended the organization of a corporation with a capital of $1,500,000, ten per cent to be paid in cash and the remainder by conveyance to the company of lands to that amount, the corporation to take title to all the lands, to issue scrip to the amount of $6,000,000 to its stockholders *pro rata*, entitling them to land corresponding to the difference between the capital and the probable ultimate value of the lands, which was stated to be the amount of the bonds and matured coupons, the scrip to be received in payment of seventy-five per cent of the price of lands when sold, with an option to the company to retire the scrip by the payment of its par value, or to purchase it "out of the company's surplus funds." The bondholders adopted the report, authorized the formation of the proposed company, directed the trustees to convey the lands to it and requested it to issue the scrip as proposed, all of which was done. The scrip was issued in the form of certificates of ownership, transferable by assignment or delivery. Each certificate contained the statement that it would be received by the company in payment for seventy-five per centum of the price of the company's lands at regular selling rates, and that it was redeemable at the option of the company at its par value in cash. The company so organized sold lands and received on some of the sales land scrip in part payment, and also purchased scrip, all of which was canceled; it thereafter purchased about $1,100,000 of scrip, which was paid for eventually out of the proceeds of land sales and rents; this instead of being canceled was distributed as a dividend to the stockholders. The company subsequently sold a large quantity of the land to P., who had been one of its directors but who resigned three days before the transaction, for $544,006.98 in cash, and $1,631,900 in scrip, of which $826,800 was reissued scrip. Of the cash payment the company distributed $450,000 as a dividend to its stockholders; said sale was made in good faith and was ratified by a majority of the stockholders. In an action against the company, its directors and P., brought

by holders of outstanding scrip to recover of the individual defendants in the name of the company the amount of the reissued scrip, and to compel the application thereof to the retirement of outstanding scrip, *held*, that the company, to the extent of three-fourths of the lands and their proceeds, held the same as trustee for the scripholders, to sell for their benefit until they were paid the face value of their scrip ; that the scrip dividend was a breach of trust, as was the cash dividend to the extent of three-fourths thereof ; that the rights of the scripholders were not limited to the terms of the certificates, but that in connection with them, were to be read the directions given to the committee, its report, the resolutions adopted and the separate conveyances of the land; and that all of the provisions relating to that part of the land conveyed to the company for the scrip became, upon its acceptance of the conveyance, its own obligations, which it could not lawfully evade or violate.

Plaintiffs brought a former action against the company alone to restrain it from reissuing scrip; a temporary injunction was issued therein which was by their consent vacated without prejudice to either party. *Held*, that plaintiffs did not thereby consent to the acts complained of here.

The complaint contained a prayer for general relief. *Held*, that after an answer was interposed, plaintiffs were entitled to any relief warranted by the facts proved, consistent with those alleged and not hostile to the pleader's theory of the action, although not precisely conforming thereto.

Argued April 21, 1892; decided October 1, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made May 16, 1890, which affirmed a judgment in favor of defendants entered upon a decision of the court on trial at Special Term.

This was an action by the plaintiffs, as holders of certain scrip issued by the New York and Texas Land Company (Limited), in behalf of themselves and all other scripholders similarly situated, to recover from the directors of that corporation, in its name, the sum of $1,100,000, and to compel the application thereof to the retirement of outstanding scrip and for other relief.

In 1879, the International and Great Northern Railroad Company, which was created by the consolidation of two other Texas railroad companies, known as the Houston and Great

Northern and the International, owned 4,754,173 acres of land situated in said state, together with 5,907 town lots and certain instruments entitling it to more land, which upon the trial were treated as land.    At the same time there was outstanding certain second mortgage bonds, due and unpaid, issued by the consolidated company, amounting with interest to over $7,000,000, which was about the value of said lands and land interests, according to the rate at which the state of Texas was selling similar lands.    On the 1st of November, 1879, the International and Great Northern Railroad Company conveyed said lands and interests to John S. Kennedy, Samuel Thorn and William Walter Phelps, as trustees for the second mortgage. bondholders, in full satisfaction of their claims against each and all of said railroad companies.    After the bondholders thus, through their trustees, became the owners of the land, they appointed a committee from their own number, consisting of Moses Taylor, William Walter Phelps, John S. Kennedy, Samuel Thorn and John Seeley, who were known as the purchasing committee, to act for them in handling said lands. They directed said committee " to prepare and report to them a plan by which they could, if possible, realize in money the par value of their said bonds " out of said lands.    They also directed the committee " to prepare and report to them a plan for organizing a corporation, to which said lands should be conveyed    *    *    *    in which corporation, in consideration of said conveyance and transfer, said bondholders should become individually possessed of interests, which should represent and ultimately, if possible, realize in money the par value of their said bonds."    Accordingly, the purchasing committee " sought to contrive some method by which the said lands should be so managed and disposed of as to secure to said bondholders, ultimately, the par value of " their bonds, " and to that end contrived a scheme for a corporation."    On the 19th of January, 1880, they reported to a meeting of the bondholders, in substance, as follows : They first refer to their appointment " under the plan of reorganization of the stock and bondholders of the International and Great Northern

Railroad Company," by which it was agreed to accept in satisfaction of the claims of the second mortgage bondholders, a conveyance of the land and land interests in question and state that such conveyance has been made to three trustees, " who now hold the lands  \*  \*  \*  subject to the directions of the bondholders interested."   After thus stating what there was on hand to manage and dispose of, they proceeded to the method by recommending it as expedient for the bondholders, to organize a corporation, with limited liability, under the laws of the state of New York, and added that the committee had taken the preliminary steps for that purpose.   They proposed that the corporation be organized under the name of " The New York and Texas Land Company (Limited)," with a capital of $1,500,000 to be represented by 30,000 shares, of the par value of fifty dollars each, ten per cent to be paid in cash and the remainder by conveyance to the company of lands, \*  \*  \*  to that amount.   The report continues : " But as the property of the new company will in fact greatly exceed in value the amount of nominal capital, it has been deemed advisable that the corporation thus formed should issue scrip to its stockholders, *pro rata*, entitling them to an amount of lands, corresponding to the difference between the capital and the probable ultimate value of the lands when they shall be opened for settlement."   After estimating the value of the lands and stating the facts upon which the estimate was based, they further say : " Upon this basis, the land should ultimately be worth the entire amount of the outstanding bonds and matured coupons.   The committee, therefore, recommend that the new corporation should issue scrip to the amount of $6,000,000, to be divided *pro rata* among its stockholders and to be receivable in payment of seventy-five per cent of the price of its lands at its regular selling rates, with an option to the company to retire the scrip from time to time, by the payment of its par value and liberty to purchase it out of the company's surplus funds under public notice and sealed proposals at the lowest price at which it may be offered."   Then follows a statement, showing " the general result of the pro-

posed agreement," in which the second mortgage liabilities are put down at $7,240,140, the value of the land at $7,219,866, the capital of the company at $1,500,000, and the amount of the scrip to be issued, at $6,000,000. The committee further reported "that in view of the low estimate which they have placed upon some of the lands in the foregoing statement and the advantages of putting both capital and issuable scrip in round numbers, it is best to fix the total issue at $7,500,000, instead of reducing it to the precise amount due upon the bonds and coupons. Each holder of a bond with all coupons attached will, therefore, be entitled to receive therefor six shares of stock, representing a par value of $300 and scrip for $1,200, payable in land, making a total of $1,500, or about the same as the par value of the bonds and coupons. As there are about 4,750,000 acres of land to come to the new corporation, every holder of an outstanding bond with all coupons attached would be entitled to scrip, under which he could take directly in his own name 760 acres of land on paying cash for one-fourth of the price and would virtually retain by his ownership of stock the title to 190 acres more, in addition to his interest in the revenue from cash receipts on other sales to other scrip-holders. The value of each share even after the distribution of scrip would be much greater than the value of 190 ordinary acres of land, because the lands include a very large amount of town lots and lands near depots in settled counties of the state. The holders of scrip would also have an option to take more than 760 acres of wild lands, or less than that number of more available tracts, as the price of each class of lands would be determined by the company upon a fair basis with reference to their market value and with a view to making the entire sales satisfactory to all parties interested and sufficient to make the stock ultimately worth par." Mention was made of the fact that much of the land was exempt from taxation for the period of twenty-five years from the date of the certificates, whether it was in the hands of purchasers or not. Allusion was made to the policy of the new company in surveying, selling and leasing lands and the committee add "it is expected

that by these means sufficient funds can be obtained to make the stock a regularly dividend-paying investment at an early day." As the statute under which the proposed corporation was to be formed "makes all the stockholders liable for its debts until the capital stock is fully paid up," the committee stated that it was "necessary to convey the entire property at once to the corporation and to organize it from among persons who will pay ten per cent in cash immediately upon their subscription. The committee, therefore, propose to organize the corporation upon the subscription of a few persons only, instead of waiting for the subscription of every individual bondholder; the subscribers paying all the capital stock in full and agreeing to transfer to each bondholder the proper amount of stock upon the delivery of his bonds, or of the receipts given by this committee for such bonds. Bondholders will thus receive their stock free and clear from any liability whatever; the capital stock being fully paid up before any certificates are issued to them."

When said report was made, the bondholders, by formal resolutions, unanimously adopted and ratified the same "in each and every particular," directed the trustees to convey the lands and land interests to the land company, " and authorized said purchasing committee in their behalf to complete the organization of the defendant, the New York and Texas Land Company (Limited), upon the terms and for the purposes set forth in said report." * * * "They also requested the land company to issue scrip to the stockholders in accordance with the plan reported by the committee, except that the liberty to buy in the same under sealed proposals was restricted to purchasers at a rate not exceeding its par value."

The defendant corporation was organized accordingly, and all the land and land interests were conveyed and transferred to it, pursuant to a formal offer, one-fifth in payment of the balance due upon subscriptions to stock, and four-fifths in consideration of the land scrip, to be issued to the bondholders in accordance with said report. The stock and scrip were issued to the bondholders about the month of March, 1880. The

land scrip, as finally issued, was in the form of a certificate of ownership of such scrip to the amount of $1,000 par value, transferrable by assignment, or by delivery merely, when certified to the bearer.   The whole amount issued was $6,000,000, and each certificate contained the following statement: "This certificate will be received by the company in payment for seventy-five per centum of the price of the company's land, at the regular selling rates, to be by it fixed from time to time. It is redeemable at the option of the company at any time by the payment of its par value in cash to the holder."   It is alleged in the complaint, and not denied in the answers, that the certificates first issued did not contain the foregoing statement, but they were soon exchanged for others in the form already described.   Thus each holder of a bond, amounting with interest to $1,500, became the owner of stock of the land company to the amount of $300, and of scrip to the amount of $1,200, while the company itself became the owner of 4,754,173 acres of land and 5,907 town lots, together worth about $7,500,000.

The plaintiff Rogers, as one of the bondholders, received scrip to the amount of $114,000, which he has held ever since, and in July, 1886, the plaintiff Denny became the owner by purchase of scrip to the amount of $100,000, which he still holds.   Mr. Tod, originally a plaintiff, is no longer a party to the action.   Since August 11, 1885, the individual defendants, except Mr. Phelps, have been directors of the land company, and composed a majority of the board.   Mr. Phelps was a director from the same date until April 27, 1887, when he resigned.

The land company at various times received land scrip in part payment for lands sold, and forthwith physically canceled the same and never attempted to reissue any part thereof. "On April 27, 1883, the said land company issued a circular inviting proposals for the sale of land scrip to it, for the purpose of cancellation, and in accordance with such circular accepted proposals for the sale of $2,486,300 par value of such scrip at about fifty per centum of its par value, all of which

land scrip was physically canceled and retired by the said company, and has never been reissued. On or about December 1, 1883, the said company again invited proposals for the sale of its land scrip to it by means of a circular, in which nothing was said concerning cancellation, and under this circular received and accepted proposals for the sale to it of about $584,000 in par value of its land scrip, at the price of about fifty per centum of its par value, and purchased and received its land scrip to that amount. For the purpose of purchasing other land scrip, the said company borrowed from the National City Bank of New York the sum of $240,000, and purchased therewith in the market, and not under any circular or upon any bids made in pursuance thereof, its land scrip to the par value of $524,800, which loan continued for some time after the said land scrip had been acquired, but which was eventually paid off, in part from the proceeds of land sales and in part from the collection of rents on leased lands." By the 13th of April, 1887, land scrip amounting to over $3,000,000 par value had been purchased by the land company, or received as part payment of land sold, and formally canceled, and at the same date the company had purchased other scrip out of the proceeds received from its lands to the amount, in all, of $1,125,000, par value, which it did not formally cancel.

Early in April, 1887, the directors were advised by counsel, and in good faith believed, that a considerable portion of the land belonging to the company would be forfeited to the state of Texas under its laws, unless it was "speedily sold and conveyed to some grantee other than a corporation." At a meeting of the directors held April 13, 1887, all of the individual defendants, constituting the entire board and controlling a majority of the stock, being present, it was resolved that the two blocks of scrip, so purchased as aforesaid, of the par value of $584,000 and $524,800, respectively, should be distributed by dividend to the stockholders in the proportion of $37.50 of scrip to each $50 of stock; that a circular should be mailed to each stockholder notifying him of the distribution, and urging

him to use the scrip immediately in the purchase of such lands as would be first forfeited unless sold; that a circular should also be mailed to all other holders of scrip, notifying them that their scrip should be used in exchange for land within a reasonable time, in order to avoid risk of loss through forfeiture of the land under the laws of Texas. On the same day a circular embodying the substance of the resolutions was mailed to each known stockholder and scripholder, and a copy thereof was received by the plaintiffs. Land scrip to the amount of $1,088,140 was immediately distributed in dividends pursuant to said resolutions, but to the amount of $36,860 was not accepted by the plaintiffs and a few other stockholders. April 30, 1887, the land company sold and conveyed, pursuant to the plan set forth in said circular, 1,087,953 acres of its land to the defendant Phelps, who was not then a director, but had resigned only three days before, for $544,006.98 in cash and $1,631,900 in land scrip. The company did not keep separate its reissued scrip, which was in the same form as the original, to the amount of $1,125,000, from its valid and legally outstanding scrip. Out of said payment of $1,631,900 in land scrip, $826,800 was reissued scrip, but it was impossible to ascertain whether any further amount of such reissued scrip was included in said payment, or to ascertain the number of the certificates of any of the reissued scrip for the purpose of identifying it. Out of the cash payment made as aforesaid to the land company, on the 30th of April, 1887, it forthwith declared and has since paid to its stockholders a dividend of $15 per share, or $450,000 in all, but took the precaution to require a bond of indemnity. The total amount of the dividends in scrip and cash paid within thirty days was $52.50 for each $50 in stock.

The amount of land scrip now outstanding is $980,300, or less than three-fourths of the amount of said dividends of $1,125,000 in reissued scrip, and $450,000 in cash. Said sale of land was made in good faith to avoid the danger of forfeiture, and the same was subsequently ratified at a general meeting of the stockholders by a vote of 18,142 shares in favor

thereof to 981 shares against it.   After such sale had been made, there still remained lands belonging to the company, as good in quality as that sold, to the amount of 2,287,496 acres, worth nearly $3,000,000, which it offered and still offers for sale at the established prices.

The plaintiffs never offered their scrip in purchase of lands, although the company has always been ready and willing to receive any outstanding scrip in payment for lands in accordance with the terms of the certificates.   After finding the foregoing facts, in substance, the trial court also found as a fact that the plaintiffs, as such scripholders, had sustained no actual injury by reason of the premises, and dismissed the complaint on that theory, although it determined and adjudged that the company had no right or power to reissue said scrip to the amount of $1,125,000, and that the same was canceled and extinguished by the purchase thereof.

*James C. Carter* and *Julien T. Davies* for appellants.

*Noah Davis* and *Thomas G. Shearman* for respondents.

VANN, J.   The plaintiffs claim that the land company is the trustee of the scripholders to the extent of three-fourths of the lands and its proceeds, and that it was a breach of trust to make the scrip dividend of $1,125,000 to the stockholders, as it in effect gave away more than 500,000 acres of land through the purchasing power of the scrip thus wrongfully divided. They further claim that the cash dividend of $450,000 was also a breach of the trust, as it amounted to a donation to the stockholders of $337,500 in money that equitably belonged to the scripholders.

The defendants deny that any part of the land was held in trust, and claim that the rights of the scripholders are confined to the privilege of using scrip to purchase land, and that as neither the plaintiffs nor any of the scripholders have been denied that right, they have no cause of action against the company or its directors.   In taking this position, the defend-

ants rely on the scrip certificates as the origin and boundary of the rights of the scripholders, while the plaintiffs, in support of their position, contend that the report of the purchasing committee, setting forth a general plan of operations, including as a part thereof the issue of scrip, is the foundation of the scripholders' rights.

In order to determine whether the certificates created and defined all the rights of their holders, it is necessary to look into the acts which brought them into existence, and to ascertain the object for which they were issued. The fundamental fact is the debt of the bondholders against the railroad company. They lent their money to that corporation and took its second mortgage bonds as security. The bonds became due and were not paid, and the road, being unable to pay them in money, conveyed land in payment, which was accepted in the place of money, because nothing better could be had. Although their claim against the railroad was thus satisfied, their debt was not collected, but was converted into land with the expectation of turning the land into money, and in that manner collecting the debt. The best method to accomplish this was a serious problem. Several hundred bondholders, who did not want land, but wanted money, had suddenly and through necessity become the owners of vast tracts of land, amounting to millions of acres, mainly unproductive and even unsurveyed, spread over fifty counties in a distant state. Partition was impracticable for many reasons, but chiefly because they did not want the land, divided or undivided, but wanted all the money that the land would bring when sold to the best advantage. An immediate sale was out of the question, because such an immense body of land could not be thrown upon the market all at once, without depressing prices and causing serious loss. Good management required that competition between owners in selling should be avoided, and that the common interest should be continued. It was necessary to make surveys, plat maps, establish local agencies and proceed by a general and comprehensive plan to dispose of the land gradually, without forcing the market. A central

agency was needed, so organized as to avoid conflict of interests, and to possess supreme and irrevocable power to manage and sell.   As the bondholders could not, with convenience or advantage, sell their interests or raise money on them, situated as they were, it was desirable that some means should be devised to represent, proportionately, each bondholder's rights in the common property, and enable him to sell, mortgage or pledge it without expense or sacrifice on his part, and without injury to his associates by the sale of land in competition with them.   Such was the situation and the needs of the bondholders when they met to take action with reference to the land, and in the light of which that action must be considered.   What did they do?   They first gave general directions to the purchasing committee to prepare and report a plan by which they could, if possible, realize in money the par value of their bonds and coupons out of the land.   Thus they treated their debt as still existing and as the basis of all action, and their primary purpose, as thus declared, was to collect that debt out of the land, the only means then left.   They next gave specific directions to the committee to prepare and report a plan for organizing a corporation to which the land should be conveyed, and in which, in consideration of such conveyance, they should, individually, have interests that should represent, and ultimately, if possible, realize in money the par value of their bonds.

These brief instruction  show an intelligent comprehension of the situation, and an ingenious adaptation of means to the single end in view, which was to collect their debt by converting the land into money to the best advantage and thereby to " realize " in money the amount of their bonds.

The committee, acting within the lines of their instructions, " sought to contrive some method by which the land should be *so managed and disposed of* as to secure to said bondholders, ultimately, the par value of their bonds and coupons, and * * * to that end contrived a scheme for a corporation." The collection of the debt was uppermost in their minds also, and the formation of the corporation to act as land agent, with

the powers and on the grand scale required, was regarded as the best available method of accomplishing that object. Accordingly their report embraced the creation of a corporation to take title to the land, with a capital of $1,500,000; ten per cent to be paid in cash, because the law required it, and the remainder in land "to that amount," meaning in land worth the amount unpaid upon the stock. It provided for the issue of scrip to the extent of $6,000,000, entitling the stockholders to "an amount of lands" corresponding to the difference between the capital and the ultimate value of all the land, estimated at $7,500,000 on the basis of the selling rate fixed by the state of Texas for its land of similar character. Each holder of a bond with all coupons attached, amounting to $1,500, was to receive $300 in stock and $1,200 in scrip. Upon this basis, as the committee reported, the land would "ultimately be worth the entire amount of the *outstanding* bonds and coupons," thus proceeding on the theory, for the purpose of the proposed arrangement, that the bonds were still in existence and unpaid, and that every effort should be in the direction of collecting the debt they represented out of the land. The scrip was "to be receivable in payment of seventy-five per cent of the price of the land at the regular selling rates, with an option to the company to retire the scrip from time to time by the payment of its par value and liberty to purchase it out of the company's *surplus funds* under public notice and sealed proposals at the lowest prices at which it may be offered." The bondholders unanimously adopted the report which thus became their plan for the management and disposition of the land. The defendant corporation was accordingly organized, having, as one of its expressed objects, the purchase and sale of land in the state of Texas, and one-fifth of all the land was conveyed to it in consideration of the capital stock, and four-fifths in consideration of the land scrip. The scrip, as issued, did not contain the provision mentioned in the report that the company should be at liberty to purchase it out of its surplus funds under public notice and sealed proposals.

, Thus the land, which was regarded by all concerned as standing for the debt of the bondholders against the railroad company, became the basis of the capital, the business and the obligations of the corporation to which it was conveyed. That corporation was charged, by the knowledge of its directors, the source of its title and the consideration paid for the land, with notice of the proceedings of the bondholders which led to its existence, as well as their object in causing it to be organized. (*King* v. *Barnes*, 109 N. Y. 267, 288 ; *Bommer* v. *American Spiral, etc., Co.*, 81 id. 468, 473 ; *Goddington* v. *Davis*, 1 id. 186; *Rogers* v. *N. Y. & Texas Land Co.*, 17 N. Y. S. R. 131.) The directions given to the purchasing committee, the report of that committee, the resolutions adopting it and the separate conveyances of the land are to be read in connection with the certificates and form a part thereof as much as if embodied in or indorsed upon them. (*Boardman* v. *Lake Shore & M. S. R. R. Co.*, 84 N. Y. 157, 172 ; *Wilson* v. *Randall*, 67 id. 338 ; *Rogers* v. *Smith*, 47 id. 324 ; *Hathaway* v. *Payne*, 34 id. 92, 100 ; *Wright* v. *Douglass*, 7 id. 564, 573 ; *Stow* v. *Tifft*, 15 Johns. 457 ; *Bailey* v. *Railroad Co.*, 17 Wall. 96, 106 ; 1 Greenl. Ev. §§ 277, 283, 286 ; 2 Parsons on Con. 66, 68.)

The certificates were mere instruments of convenience to aid in carrying out the prior contract made by the bondholders with each other. That contract was made by adopting the report of the purchasing committee, and it constituted the only authority that the trustees had to convey the land to the corporation defendant. As it contained nothing inconsistent with the statute under which the corporation was organized, the contract became binding upon it, because, with complete notice of all the facts, it took title under it. All the provisions relating to that part of the land conveyed for the scrip became its own obligations, which it could not lawfully evade or violate. (*Edwards* v. *Grand Junction Ry. Co.*, 1 Mylne & Cr. 650, 672 ; *Stanley* v. *Chester & Birkenhead R. Co.*, 9 Sim. Ch. 264; *Wood* v. *Whelen*, 93 Ill. 153 ; *Low* v. *Conn., etc., R. R. Co.*, 46 N. H. 284 ; *Stanton* v. *N. Y. & E. Ry. Co.*, 59 Conn. 272 ; *Whitney* v. *Wyman*, 101 U. S. 392 ; Angell & Ames Corp. § 804 ; Green's Brice Ultra Vires, 462.)

The bondholders were the promoters of the land company. Being about to form a corporation for an authorized purpose, they made an agreement upon the subject in which they provided for benefits to be conferred upon it and burdens to be assumed by it after its organization. While it could have refused, when it came into existence, to accept the one or to be bound by the other, it could not accept the advantages and then refuse to assume the obligations. By accepting title to the land it adopted and ratified the agreement entered into by all its stockholders, and thereby voluntarily made itself a party thereto and became bound thereby. The adoption by the land company of the contract between the bondholders was a reasonable means of carrying into effect its authorized objects, and, after knowingly receiving the benefit of the arrangement, "it cannot be permitted to deny that it agreed to assume the corresponding burdens." (Morawetz on Corporations, § 548, and cases cited.) There can be little doubt as to the intention of the promoters that the corporation, when formed, was not only to become a party to the agreement, but was to be the chief actor to carry it into effect. They created it exclusively as an executive agent to effect their purpose, and when that purpose is completely accomplished by the sale of all the land and the proper application of the proceeds, the object of the corporation will have been fully attained.

The land company was not in the position of a *bona fide* purchaser as to the land represented by the scrip, because it paid nothing therefor, although it assumed certain duties with reference thereto. By independent conveyances one-fifth of the land was conveyed to make up its capital and four-fifths for scrip, which was treated as representing a debt to be collected, or at the rate of a dollar of scrip for a dollar of debt. This correspondence in amount was not accidental, but was the result of the carefully matured plan embraced in the bondholders' contract. Express provision was made to convey land enough to pay up the subscriptions for stock and implied provision for the conveyance of the remainder as the basis upon which scrip was to be issued. This indicates that

one-fifth of the land belonged to the corporation absolutely, because it had paid for it, and that four-fifths did not belong to it absolutely, or at least not beneficially, because it had not paid for it, but held the legal title for the benefit of the scripholders, to dispose of it and collect, if possible, so much of the debt as the scrip represented. In order, however, to provide for expenses, and perhaps for dividends also, the certificates limited the beneficial interest of the holders to three-fourths instead of four-fifths. There was also the further limitation in aid of dividends that when their scrip was paid without interest their claim upon the land, as scripholders, absolutely ceased. Unless it was the intention to devote this proportion of the land to the benefit of the scripholders, until they were paid, why was not all the land conveyed in payment for stock, as scrip could then have been issued with all the attributes that the defendants claim the scrip in question possessed? No increase in the amount of stock would have been necessary and the absolute ownership of so much land would have extended the credit of the company proportionately. There was no reason for making the stock the consideration for one-fifth and the scrip the consideration for four-fifths of the land, unless it was intended to make the obligations assumed by the company in issuing the scrip a charge upon the proceeds of the land. Nor was there otherwise any reason for giving to the company the liberty in advance, as part of the general scheme, to buy in scrip out of its surplus funds. This right is conceded to exist, although it is not so stated in the certificate. What is meant by the expression "surplus funds," as thus used? All funds were to come out of the land, and, except the slight income from leases, from the sale of land. When land was sold, one-fourth of the purchase-price had to be paid in cash. That represented the stockholders' interest, and belonged to the corporation absolutely to use in payment of expenses or dividends, or for any lawful purpose. The remainder of the purchase-price could be paid either in scrip or cash. When payment thereof was made in scrip, it was *ipso facto* canceled, and a proportionate part of the bondholders' debt was discharged. When payment of

the balance was made in money, if it belonged to the company absolutely with no charge thereon, there would have been no necessity of providing that the company might use it to buy scrip, for it would.have had that right anyway. (*City Bank of Columbus* v. *Bruce*, 17 N. Y. 507; *Hubbell* v. *Blakeslee*, 71 id. 63; *Vail* v. *Hamilton*, 85 id. 453, 457; *Barry* v. *Missouri, etc., Ry. Co.*, 34 Fed. Rep. 829, 833.) If, however,. there was a charge upon it for. the benefit of the scripholding interest, express permission would be required in order to lawfully use it for that purpose. From the fact that the company did not need permission to use what belonged to it, but did need permission to use what did not belong to it, the inference is permitted that the words " surplus funds " have reference to money that was regarded as belonging to others, or to what was left after deducting from the proceeds of cash sales the one-fourth belonging to the company. No other meaning as reasonable or satisfactory has been assigned to this expression, when the circumstances under which it was used are taken into account. (*Rogers* v. *N. Y. & Texas Land Co.*, 17 N. Y. S. R. 131, 136.)

The assent, obtained when the scheme was adopted, that the company might use a certain fund as its own, necessarily implies that the fund was not to be its own, but was to belong to the scripholders. It would have been strange if the bondholders, led as they were by men of the clearest insight, in adopting a plan of operations that obviously contemplated a separation in the ownership of stock and scrip, had provided for consent in advance by the scripholders that three-fourths of the proceeds of cash sales could be used for a special purpose, unless that consent was considered necessary. It could not have been considered necessary unless the money that the consent referred to was intended to be held for the benefit of the scripholders. If it was to be so held, it constituted a trust fund, and if a trust existed as to three-fourths of the proceeds of cash sales, it existed as to three-fourths of the proceeds of all sales. It is true that no trust was created *eo nomine*, but it is not necessary to use the word " trust " in order to create

one. (*Fisher* v. *Fields*, 10 Johns. 495, 505; *Hathaway* v. *Hathaway*, 37 Hun, 265, 267; 1 Lewin on Trusts, 109; Hill on Trustees, 101; Perry on Trusts, § 82.)

The nature of the relation of the land company to the scrip-holders, as set forth in the contract between the bondholders, their object in making the contract, the peculiar circumstances surrounding the parties when it was made, the separate conveyances of the land and the consideration of each, determine whether there was a trust or not. When land of great value is conveyed for no substantial consideration, and yet with no intention of making a gift, the probabilities favor the existence of reserved rights in the nature of a trust and slight evidence as to the intent of the parties will suffice to establish one. In this case land worth millions was conveyed to a grantee created at the time by the grantors expressly for the purpose of taking the title in their interest and yet it is alleged that it was an absolute sale and that the consideration was the privilege of buying back three-fourths of the four-fifths so transferred, at a rate to be fixed by the grantee. But the mind at once rejects such a transaction as incomplete and asks, "What else was there to it? What was the object? What were the circumstances? What did the parties do and say beforehand? What led up to the conveyance of the land?" When these questions are fully answered, it appears that the grantee was charged in advance with the performance of active and substantial duties with respect to the management and disposition of the land for the benefit of the bondholders, who were virtually the grantors. The trust sprang out of the situation, the contract, the transfers and the general purpose. The land company was to act as a land agent, holding the title for convenience in transfer and control. The bondholders organized it for this purpose. They created it as a servant, not as a master. They did not want it as a means of investing money at a profit, but as a means of collecting an investment previously made. They conformed to the statute by giving it capital, paying money and conveying a given quantity of land for that purpose. By another deed they conveyed much more land to

it. For what purpose? Was it for the privilege of buying back a part by giving all that they received for the whole? Was it merely for the privileges set forth in the certificates? Do reasonable men part with property on such conditions?

We think that their purpose is clearly indicated by what they said and did, interpreted in the light of the circumstances surrounding them at the time. They intended that the land company should hold one-fourth of the land as its own and three-fourths in trust, to sell for the benefit of the scripholders until they were paid the face value of their scrip, without interest, when the remainder was to belong absolutely to the company. They thus made adequate provision for the protection of both stockholders and scripholders, whose interests, although identical at first, were to become separated and relatively unequal as soon as stock and scrip were held in amounts differing from the basis of issue. This they had in contemplation and to facilitate it, made the scrip so that it could become negotiable by manual delivery. There was no conflict of interest between the stockholders and scripholders, because each class received its due proportion of the proceeds of any sale of land, whether large or small. One-fourth, always in money, went to the corporation for the benefit of its stockholders, while three-fourths, either in money or surrendered scrip, went to the corporation for the benefit of the scripholders; the scrip to be canceled and the money to be held or used in their interest. Without competition between those interested, there was every inducement to sell as rapidly and for as high a price as possible, for in this way the corporation would make the most money for itself and the scripholders would be benefited proportionately. Moreover, after the scripholders were paid the face value of their scrip, all that was left of land, or proceeds of land, would go to the stock-holding interest, which would then become sole and supreme, because the trust obligation would have been discharged. Ample provision was made to get rid of the scrip by buying it in for cancellation at such prices as might be agreed upon, as well as by *redeeming* it for cash at par and yet the corporation was not burdened

with the obligation to redeem, except by applying the fund devoted to that purpose derived from sales of land wholly for cash. The two interests were so nicely adjusted that prosperity or adversity came alike to each.

There was no inducement to sell at a sacrifice, for the loss fell upon the company, in the same proportion that it did on the scripholders. There was no opportunity for favoritism, or for discrimination in favor of one interest against the other because what helped or hurt one, was reciprocal as to the other. Whether land was paid for in cash or scrip was equally immaterial to either interest, as each was benefited in the proper proportion. As thus interpreted the scheme was simple, safe and admirably adapted to work out the great object that the bondholders had in view from the outset, which was to collect their debt out of the land. As we read the words of the contracting parties and look upon their acts, no other construction is reasonable or natural.

On the other hand singular results follow the interpretation contended for by the defendants. It makes inevitable a conflict between the stockholding and scripholding interests by holding out a constant inducement to the former to sacrifice the latter. It subordinates three-fourths to one-fourth. It furnishes no adequate protection to the scripholder and is inconsistent with the object, predominant from the outset, of collecting the entire debt of the bondholders out of the land. It breaks up the common interest and introduces discord where there should be harmony. More significant than all, it permits the corporation, which was formed to serve the interests of both stockholders and scripholders, to sell all of the land in bulk for cash and to pay out the proceeds in dividends to its stockholders. Conceding that the scripholders might have a remedy for such an act, as against the corporation it would be worthless, and as against the directors, it might be. Considering the object that the bondholders had in view, is it probable that they devised such a plan or made such a contract?

The purchasing committee expressed the expectation in their report that the stock would pay regular dividends at an early

day and that the stock would ultimately be worth par. Why did they not use " certainty " instead of " expectation," if the proceeds of all the cash sales, the three-fourths as well as the one-fourth, could lawfully be used in payment of dividends? On that theory could there have been any doubt as to liberal dividends from the start? But, it is said, the scripholders could protect themselves at any time by taking land for their scrip. That is true and it is the only absolute right conceded to them by the defendants, but what was it worth to men who went into the scheme to collect a debt, not to buy land? What would it be worth when all the land was gone? What would it be worth after the scrip had been diluted by repeated reissues until there was not land enough to satisfy its requirements? It was doubtless one object of the arrangement to encourage scripholders to accept land for scrip, but it was not intended to compel them to do so, although that would be the natural result of the construction contended for and the policy pursued by the stockholding interest.

It is argued that the existence of a trust would have defeated the whole scheme by spreading a lien over all the lands and making them unsalable, but a trust to sell and distribute, which was the object of the trust in question, has no such effect. It enables the trustees to give a perfect title to the land and fastens a lien upon its proceeds. " It is a universal rule," says Mr. Pomeroy, " that the trustee's estate and power over the subject-matter are commensurate with the duties which the trust devolves upon him and are sufficient to enable him to discharge all those duties." (Pom. Eq. Jur. § 991.) " In all instances," he continues in the next section, " where the trust is to sell the corpus of the property and to distribute the proceeds * * * the beneficiaries plainly acquire no proper estate in the original trust fund prior to its sale; their right and interest attach to the proceeds of this fund, which are to be paid to or distributed among them." Thus the land company could convey the land, freed from the trust, confer an unimpeachable title upon the purchaser and hold one-fourth of the proceeds for its stockholders, unaffected by the trust,

and three-fourths in trust for the scripholders. In so doing it would not exceed its corporate powers, because it was authorized by its charter, which conformed to the statute (L. 1875, ch. 611, § 1), to purchase and sell lands and it purchased one-fourth of the lands absolutely and three-fourths subject to the performance of a trust and after the trust was performed and the scrip was out of the way, all that remained of the three-fourths was to be its absolute property. It was a purchase by assuming a trust obligation as the method of payment. It was a profitable purchase, for while the outstanding scrip amounts to less than one million of dollars, the value of the land unsold is nearly three millions. This does not take into account the unauthorized dividend in stock and scrip, amounting to more than the face value of the stock. In 1886, when one of the plaintiffs bought his scrip at 58, stock was selling at 187.

The threatened danger of loss by forfeiture of a part of the lands under the statutes of the state where they were situated, did not enlarge the powers of the directors of the land company, although it should be taken into account in considering their motives. The rights of the scripholders were fixed by contract and they could not be changed or destroyed even by acts done with an intention to save the beneficiaries of the trust from loss. Possibly the forfeiture could have been prevented in some other way, as by reducing the selling rates of the land in danger, so as to stimulate immediate sales, or by some method other than that pursued, which, as it benefited the stockholders to the same extent that it injured the scripholders, may have affected the judgment of those whose personal interests were identified with the former rather than the latter.

The suggestion that what the scripholders lost, as such, they gained as stockholders would be true if all held stock and scrip in the same proportion that it was first issued, but such is not the case. While it may be true as to one of the plaintiffs, he properly refused to accept the unauthorized dividend, because he had no right to it as long as there were some scripholders who owned no stock and others who owned a relative excess

of scrip.   It cannot be claimed that he has sustained no injury, because he rejected an offer made in violation of law.

The complaint is properly criticised as insufficient in some respects, but as an answer was served, a trial had and every essential fact not only proved but found by the court, the plaintiffs were entitled to any relief consistent with the case made by their complaint and embraced within the issues. (Code Civ. Pro. § 1207 ; *Hemmingway* v. *Poucher*, 98 N. Y. 281 ; *Wetmore* v. *Porter*, 92 id. 76 ; *Murtha* v. *Curley*, 90 id. 372 ; *Andrew* v. *New Jersey S. Co.*, 11 Hun, 490.) While the complaint is not as full as it should be, still the plaintiffs were entitled to relief upon the facts alleged and if it had been amended so as to conform to the proof, all deficiencies would have been supplied.   There was a prayer for general relief and, after an answer has been interposed, any judgment may be awarded that is warranted by the facts proved and consistent with the facts alleged, even if it does not precisely conform to the pleader's theory of the action, provided it is not hostile thereto.

It is claimed that the plaintiffs by consenting that a temporary injunction procured by them in another action brought against the land company as sole defendant, restraining it from reissuing the scrip (*Rogers* v. *N. Y. & Texas Land Co., supra*), should be vacated, they in effect consented to the acts now complained of.   The order vacating the injunction was made without prejudice to either party, so that the defendant corporation is in no position to take advantage of it. (*Creighton* v. *Kerr*, 20 Wall. 8.)   As it does not appear that the directors were misled, or prejudiced by the action of the plaintiffs, or that they relied upon it in their subsequent proceedings, it is difficult to see how they can take advantage of it.   The action was not discontinued, but was kept alive as a continued assertion of the right to a permanent injunction and there is neither finding nor evidence that the plaintiffs' consent was given to induce action by the company or its directors, or for any purpose, except to avoid the risk of liability on the undertaking.   In thus consenting they did not abandon their

right to a permanent injunction after a trial of the action on the merits.

Having decided that a trust existed in favor of the scripholders, we regard our duty upon this appeal as discharged, for it is obvious that the trust was violated by the reissue of the canceled scrip and the gift thereof to the stockholders, as well as by the gift to them of three-fourths of the $450,000 in money received upon the sale of land. It was an unauthorized appropriation of that which had been dedicated to the use of the scripholders and entitled them to relief, but it is unnecessary to now decide as to its nature or extent, as a new trial will be necessary and additional facts may then appear that will have a bearing upon the subject.

The judgment should be reversed and a new trial granted, with costs to abide event.

All concur.

Judgment reversed. _____