## DE CHAMBRUN v. SCHERMERHORN.

(Circuit Court, S. D. New York. January 11, 1894.)

**1. TRUSTS—AGREEMENT ABSOLUTE IN TERMS—EVIDENCE.**
By a contract between parties in confidential relations, similar to, if not technically, those of attorney and client, one of them, interested in certain litigations, agreed, in consideration of services rendered therein by the other, to pay him a certain sum, which was made a lien on the promisor's interest in the litigation. His interest therein did not exceed the sum named, and the services mentioned were apparently compensated by previous payments and a monthly salary. That the promisor had an interest in the contract was indicated by the subsequent relations of the parties and statements by the other party, who also admitted, after the promisor's death, that he, if alive, would have testified to a trust in his own favor; and there was evidence that he believed in the existence of such a trust. *Held,* that this established a trust as to the balance after payment of the value of the services rendered.

**2. SAME—FRAUD AS TO THIRD PARTIES—EQUITY.**
In view of the relations between the parties, equitable relief should not be refused in such case because the contract was given to prevent third parties from reaching the fund by means of inequitable contracts previously given to them, for which inadequate consideration had been rendered.

**3. RES JUDICATA.**
A decree of a state court is not a bar to a suit in a federal court on a question which, although it might possibly have been litigated in the state court if properly pleaded, was in fact neither pleaded nor litigated.

In Equity. Suit by Pierre De Chambrun, as administrator of Charles A. De Chambrun, against George J. Schermerhorn, to establish and enforce a trust. Decree for complainant.

Everett P. Wheeler and Wyllys Hodges, for complainant.

Louis Marshall, George C. Lay, and Arthur H. Masten, for defendant.

COXE, District Judge. The complainant asks for a decree declaring that a contract, in the nature of a mortgage, for $30,000 made by his intestate, Charles A. De Chambrun, and delivered to the defendant, was in fact made for the benefit of De Chambrun and was held in trust for him by the defendant. This contract grew out of the so-called "Jumel litigation," and was one of several given by De Chambrun to parties who assisted the heirs of Stephen Jumel to recover their property. It is as follows:

"It is hereby stipulated and agreed by and between Charles Adolphe de Chambrun, as attorney in fact of the heirs at law and next of kin of Stephen Jumel, deceased, late of the city of New York, and George J. Schermerhorn, attorney at law, of the city of New York, that in consideration of the services rendered by said Schermerhorn, at the request of said Chambrun, and in behalf of said heirs at law and next of kin of said Stephen Jumel, in litigations involving the title to premises in the city of New York, at one time owned by

said Stephen Jumel, said Chambrun agrees to pay said Schermerhorn the sum of thirty thousand dollars ($30,000,) and such sum of $30,000 is hereby made a lien upon any money or property which said Chambrun may receive for said heirs at law and next of kin as aforesaid. It is further agreed that this agreement shall bind the heirs, executors, administrators, successors and assigns of the respective parties hereto. In witness whereof, the above-named parties have hereunto set their names and seals at the city of New York, this 28th day of August, 1880.

"Charles Adolphe de Chambrun. [L. S.]
"Geo. J. Schermerhorn. [L. S.]"

Many of the facts applicable to this controversy will be found reported in the case of De Chambrun v. Campbell, 54 Fed. 231, and it is unnecessary to state them again. Three questions arise on this record. First. Was the agreement just quoted given to the defendant in trust? Second. If given in trust, was the object to defraud other claimants upon the Jumel fund, and, if so, can one who was particeps fraudis enforce such a trust against his accomplice? Third. Is the decree of the state court, adjudging that the contract in question belongs to the defendant, a bar to this action? I have reached the conclusion that De Chambrun had an interest in the contract of 1880. Some of the reasons for this conclusion, briefly stated, are as follows:

First. It is conceded that the relations between De Chambrun and the defendant were of the most intimate and confidential character. They occupied the same law office and if their relations, technically, were not those of attorney and client they were in all respects very similar and demanded similar duties and obligations. The proof indicates that the defendant was treated more like a relative, a confidential clerk, or a private secretary than as a mere legal adviser. It appears from the correspondence that De Chambrun's most secret thoughts were freely communicated to the defendant and that the most implicit trust was imposed in him. The defendant fully recognized his obligation to protect De Chambrun's interests. "It is my intention," he writes, "to follow through to the end all my dealings with you in the most manly and honorable manner I am capable of." If a trust were to be created it is certain that the defendant is the one man who would have been selected to receive it. These relations of trust and confidence should be kept steadily in view in considering the question of fact. When they exist the slightest evidence is sometimes sufficient to overthrow an instrument valid upon its face, if, indeed, the burden is not upon the holder of the instrument to prove the bona fides of the transaction. 3 Greenl. Ev. § 253; Whitehead v. Kennedy, 69 N. Y. 466; Zeigler v. Hughes, 55 Ill. 288, 295; Rogers v. Land Co., 134 N. Y. 197, 214, 32 N. E. 27; Pom. Eq. Jur. § 951. In Brown v. Bulkley, 14 N. J. Eq. 451, 458, the chancellor holds that all securities taken by a solicitor are presumptively void and the onus is on him to show them fair and upon sufficient consideration. They will be allowed to stand only for the actual indebtedness as found by the court. The rule laid down by Judge Sharswood is quoted with approval. "When the relation of solicitor and client exists and a security is taken by the solicitor from his client, the pre-

sumption is that the transaction is unfair, and the onus of proving its fairness is upon the solicitor."

Second. The character of the instrument itself should be considered. Unlike most of the other contracts it was an absolute agreement to pay $30,000. Chester v. Jumel, 125 N. Y. 237, 253, 26 N. E. 297. It was a mortgage. It was not contingent, for a settlement had already taken place which made it good almost beyond a doubt. On the 25th of October, 1876, De Chambrun made an agreement with the defendant by which he promised to pay him the sum of $10,500 for services performed within the next 90 days. The agreement of August, 1880, must have been given, therefore, assuming it to be absolute, for services rendered by the defendant during three years and seven months. Between the dates of the two contracts, however, another agreement was made by which De Chambrun promised to pay the defendant $100 a month for his services. Under it the defendant received $3,175 before and $2,100 after the August agreement. That a further absolute agreement to pay $30,000 should be given at this time and in such circumstances is, at least, strange. The reason for it offered by the defendant is unsatisfactory.

Third. The consideration was inadequate. That the defendant rendered faithful and valuable services in the Jumel litigation is beyond dispute, but, upon the proof now presented to the court, it cannot be said that they were worth the sum of $79,000 which he has received. It may be that on an accounting the defendant will be able to show that his services were worth much more than now appears to be their value, but on this record it seems that they were entirely clerical in character and such as could be performed by a competent and intelligent law clerk. It is not pretended that he took part in the trial or arguments in court or did any of the work for which large fees have been usually awarded to members of the legal profession.

Fourth. The correspondence and documentary evidence, though devoid of any direct admission of a trust, seem to bear out the theory that there was a joint interest in the contract. Until the final rupture the defendant constantly speaks of his own and De Chambrun's interests as if they were to stand or fall together. In the proposed agreements of August, 1884, February, 1886, and even as late as the agreement of April 12, 1888, this community of interest is recognized. It is certain that up to the very latest stage of the litigation the parties never contemplated the result which followed. It is conceded on all hands that "the whole burden of the work fell upon De Chambrun and his new associates. The enormous work performed by them can hardly be explained or understood without a personal examination of the papers. * * * That the work as thus carried on was due to the indomitable energy and pluck of De Chambrun. That anything has been realized is due to him and his associates whom he inspired with his own spirit." In 1883 De Chambrun had assigned away considerably more than his interest in the Jumel property and yet a settlement of the litigation which cut him off entirely would undoubtedly have been

opposed by the defendant as grossly unfair. If he (De Chambrun) had no interest in the contract of 1880 he had no interest at all. A settlement which, on the one hand, not only deprived De Chambrun of all compensation for his long and arduous services, but left him in debt some $33,000 for disbursements spent in the common cause, and, on the other, awarded nearly $80,000 to his confidential friend and adviser, would at that time, probably have seemed as inequitable to the defendant as it does now to disinterested men. That all parties desired to avoid such a result is clearly established by the correspondence. Is it not probable, therefore, that they acted and contracted in the light of a result certain to follow unless they took measures to prevent it?

Fifth. It is most unfortunate that De Chambrun died before his testimony was taken. It is, however, admitted in the defendant's brief that he would have sworn to the existence of a trust had he lived throughout the suit. Although this admission is in exact accordance with the truth and with the allegations of the complaint it is by no means a substitute for the testimony itself. If De Chambrun had testified to the trust and had sustained himself on cross-examination it would have gone a long way to convince the court of the rectitude of his position. On the other hand, if he had been broken by the cross-examination and had failed to give a reasonable explanation of the inconsistencies so often apparent in his conduct it would have had a contrary effect. This most important, and, probably, decisive testimony has not been given, and, in its room, so far as De Chambrun is concerned, is the fact that he believed in the existence of the trust and, had he lived, he would have sworn to it on the witness stand. From the very nature of the issue—whether or not a secret oral trust existed—it will be seen at a glance that direct evidence is well-nigh impossible. The complainant has, however, produced two witnesses whose testimony tends strongly to sustain the theory of a trust. It shows that just prior to the August agreement the defendant's mind was occupied with plans to prevent De Chambrun from losing what was his due, that he devoted considerable study to the subject of trusts and soon after the date of the August contract when asked about the matter declared that "it was all fixed." Several years afterwards, in 1886, he repeatedly stated that De Chambrun and he "were jointly interested in those contracts." It is sought to contradict the testimony of one of these witnesses, Mr. Norris, by proving that he made statements to Mr. Beach, a former law partner, inconsistent with his statements under oath. Beach says that Norris told him, in April, 1888, that De Chambrun had met him in Washington shortly before, and asked him if he had any knowledge of Schermerhorn's holding the contracts in trust and he had told De Chambrun that he had no such knowledge. Norris denies that he had this conversation. If it did take place it tends, unquestionably, to discredit the testimony of Norris, but it also establishes the fact that De Chambrun, in the early part of 1888, believed in the trust, was preparing to assert it and was even willing to go into what might at that time be almost thought to be the hostile camp, in order to obtain the necessary

proof.    A state of things hardly compatible with the theory that
the claim is a product of De Chambrun's imagination.

It is thought, therefore, that, bearing in mind the relations be-
tween the parties and the presumptions which follow such relations,.
enough has been shown to establish De Chambrun's interest in the
contract of 1880.

It is alleged in the complaint that the object of the trust was to
evade certain inequitable contracts previously given to others and
it is urged by the defendant that De Chambrun being a party to this
wrong can have no standing in a court of equity.    The force of this
allegation cannot be avoided although the necessity for inserting it
is not quite apparent.  It would seem that De Chambrun's intention
was not to defraud others, but to prevent those who held unfair con-
tracts, for which inadequate consideration had been rendered, from
defrauding him and his associates.    Assuming, however, that the
well-known rule is applicable that equity will not relieve a party
to a fraudulent transaction from the consequences of his own mis-
conduct, it is thought that the facts bring this cause within the
exception to the rule enunciated in Ford v. Harrington, 16 N. Y.
285, "that, as against an attorney and counselor, the law will set
aside an agreement made with his client, by which property is.
placed in his hands to keep it out of the reach of the creditors of the
client."

Are the decrees in the Chester and Tauziede Cases res judicata.
of the issue now presented?  In the Campbell Case this question
was answered in the affirmative for the reason that precisely the
same propositions there raised were passed upon and decided by the
state courts.  It is not pretended that the question whether or not a
secret oral trust existed was presented to the state courts.  Such
a question was not incident to or essentially connected with the
subject-matter of the litigation in the state courts, and it did not
come within the legitimate purview of those actions.    That De
Chambrun's conduct in the state courts was inconsistent with his
present contention may as well be conceded, but it did not amount
to an estoppel as matter of law.  The very nature of the question
precluded it from being discussed in those actions.  It was for the
interest of neither to have it bruited, it was for the interest of both
to have it kept a secret.    What motive De Chambrun could have
had in publishing the trust to the world at that time it is diffi-
cult to perceive.  A decree in complainant's favor here will not an-
tagonize the judgments of the state courts for it must proceed upon
the theory that those judgments are correct.  Although it is possible
that the question of trust might, if properly pleaded, have been
litigated in the state courts, the fact that it was neither pleaded
nor litigated is sufficient to prevent the application of the doctrine
of res judicata, within the rule of the federal courts.  Cromwell v.
County of Sac, 94 U. S. 351.

The record shows that De Chambrun was a procrastinating, ec-
centric and most irritating character.    He was impulsive, improvi-
dent and irascible, but generous, confiding and hopeful,—a true opti-
mist, a typical Frenchman.    He frequently did strange things, so-

strange, in fact, that one looks in vain for a motive. His course was at times contradictory and inexplicable upon any theory of self-interest. He was often his own worst enemy and involved himself in so many contradictory positions and visionary schemes that it is no wonder his character is attacked and his integrity impugned. And yet, with it all, I cannot believe that De Chambrun was at heart a dishonest man. His acts are to be interpreted in the light of his peculiar temperament and so viewed are capable of a more charitable construction than is placed upon them by the defendant. After studying the proofs with more than ordinary care I cannot avoid the conclusion that De Chambrun has not been fairly treated. Entertaining no doubt as to this proposition the court naturally is disposed to cut through merely formal objections and brush away technicalities which obstruct the path to equity. The defendant should be fully and liberally rewarded for the valuable services he has rendered, but when this is done he has no reason to complain if the balance, should there be one, goes to the family of the man whose labors were the most deserving of them all.

The complainant is entitled to a decree for any balance found due, after paying the defendant in full for his services, and for an accounting to determine the value of such services, with costs.