(20 App. Div. 626.)

DAVIS PROVISION CO. v. FOWLER BROS., Limited, et al.   (No. 1.)

(Supreme Court, Appellate Division, Third Department.   September 8, 1897.)

1. SALES—DAMAGES—MEASURE—FALL IN MARKET PRICE.
   The fall in market price is a reasonable measure of damages for not delivering goods ordered for the Christmas trade until after such trade was over.

2. APPEAL—VOLUMINOUS RECORD—CITATION OF FOLIOS.
   Where a record is voluminous, and involves many separate items, the court will trace any one item only by examining the folios cited by counsel.

3. SALES—UNCOLLECTED ITEMS—MISTAKE—INTEREST.
   Where, by reason of a mistake of defendant's bookkeeper, which mistake was known to plaintiff, defendant for over two years failed to demand and collect an item due to it from plaintiff, it is entitled to retain the interest on the item for the time it so remained uncollected, after plaintiff had paid such interest under protest.

4. PURCHASING AGENT—LIABILITY FOR DEFECTS IN GOODS.
   Where defendant acted merely as plaintiff's purchasing agent in obtaining a seller of corn for plaintiff, defendant is not liable for damages for defects in the corn, though defendant invoiced the corn as though it were the seller.

5. CORPORATIONS—DIRECTORS—POWER OF MAJORITY—DISQUALIFICATION.
   A. and B., as representatives of defendant corporation, met with C., the manager of plaintiff corporation, to adjust differences between plaintiff and defendant.   Held, that a decision of A. and B. without the consent of C. would not be binding upon plaintiff, though plaintiff's board of directors consisted of A., B., and C.

6. SALES—DEFECTIVE GOODS—WAIVER BY PAYMENT.
   Where a buyer makes seasonable demands for damages for defects in meats purchased, he does not waive such damages by paying the price of the meats.

7. SAME—DAMAGES—SETTLEMENT BY NOTES.
   A buyer executed a note to the seller for the price of meats, without making any deduction for damages for defective meats.   When the note

matured, the buyer insisted that he should be credited for such damages, whereupon the seller stated that every claim of the buyer shown to have any merit would be carefully considered and adjusted, and then the buyer gave renewal notes for said note, which he subsequently paid. *Held*, that said damages were not settled by said note.

8. JUDGMENT—PAYMENT—STIPULATION—COUNTERCLAIM.
Where a buyer has paid a judgment for the price of meats, with the stipulation.that such payment was to be without prejudice to any and all claims by him, he may recover damages for defects in such meats.

9. EVIDENCE—STATEMENTS OF ACCOUNT—ADMISSIBILITY.
Statements of account, made from plaintiff's books, and offered on behalf of plaintiff, are admissible where they serve to explain declarations of the parties, when the statements were submitted to defendant.

10. CORPORATIONS—AGREEMENTS WITH AN INCORPORATOR.
Where a corporation agrees with a person that, if he will become an incorporator of another company, it will furnish the best of goods to such company, it is under obligation to such company, when formed, to comply with such agreement.

11. SAME—ABSORPTION OF ASSETS BY NEW COMPANY.
Where a new corporation absorbs all the assets of an old corporation, and continues to do business in the name of the old corporation, it is liable for obligations so contracted, as a principal is liable for the acts of its agent.

12. SAME.
Where a corporation permits a newly-organized corporation to absorb its assets and do business in its name, it is liable for obligations so contracted, as it assumes to be a principal in such transactions.

13. FOREIGN CORPORATIONS—RIGHT TO SUE.
Laws 1892, c. 687, § 15, prohibiting a foreign corporation from suing upon any contract made by it in the state, without a certificate from the secretary of state showing that it is authorized to do business in the state, authorizes such a corporation to maintain such a suit after it has obtained such certificate.

Appeal from judgment on report of referee.

Action by Davis Provision Company against Fowler Bros., Limited, and another. From a judgment upon the report of a referee against both defendants for $7,892.44 damages, and against defendant the Anglo-American Provision Company for $612.02, defendants appeal. Modified.

The action was brought to recover damages sustained.by the plaintiff upon meats purchased by the plaintiff of the defendants from 1886 to 1892, both years inclusive, the plaintiff alleging that it ordered meats of good quality, amounting in the aggregate to several millions of dollars, and that the defendants many times delivered to it meats of bad quality, which it accepted upon the defendants' promise to pay or allow or credit to plaintiff whatever loss it sustained thereby, but which they finally refused to do. Plaintiff also claimed to recover upon some other specified items, which are mentioned in the opinion, incidentally accruing in the course of the business. The plaintiff, in its complaint, alleged that the directors and managers of the defendants composed a majority of the directors of the plaintiff until 1893, and that such majority dictated certain so-called settlements between the plaintiff and the defendants which were unjust to the plaintiff, and plaintiff asked that the same, if necessary, be set aside, and that a true account be taken. The defendants denied the causes of action set forth in the complaint, and alleged that all of the plaintiff's claims had been adjusted and settled by and between the parties, and satisfied; and assented upon the trial that the goods were bought by plaintiff upon Chicago inspection, and that that showed that the goods were of good quality when delivered there. The referee found that there had been no valid settlement. and that the plaintiff was entitled to recover upon 14 several claims set forth in its bill of particulars.

Argued before PARKER, P. J., and LANDON, HERRICK, PUT-NAM, and MERWIN, JJ.

Wilton C. Percy and J. Newton Fiero, for appellants.

T. F. Conway, for respondent.

LANDON, J.    The plaintiff is a corporation organized in 1886 under the laws of the state of Illinois to deal in meats, provisions, and grain in Chicago, Ill., and in New York state, and elsewhere.    It complied with sections 15 and 16 of the general corporation law of this state (chapter 687, Laws 1892), authorizing it to do business in this state, and to sue and be sued.    The defendant the Anglo-American Company is also a corporation formed prior to 1886, under the laws of the state of Illinois, and at the time of the organization of the plaintiff was extensively engaged in the meat and provision business in the city of Chicago.    It had also an office in the city of New York, and a warehouse at Weehawken, N. J.    Robert D. Fowler and Anderson Fowler were the principal stockholders of the company, and, with one Robert Stobo, were its directors.    Stobo was secretary, and owned one share of stock.    Henry Davis was an expert salesman. The Fowlers were desirous of securing his services, and through him increasing their trade in the East, based upon a larger capital than Davis possessed.    Hence the plaintiff was organized mainly for the purpose of selling the meats of the Anglo-American Provision Company to traders in the state of New York and at other eastern points. Davis and the two Fowlers were at first the sole stockholders and directors of the plaintiff, Davis holding one-third of the capital stock, and the two Fowlers two-thirds.    Henry Davis was the president of the plaintiff, and manager of plaintiff's business.    He had no interest in the Anglo-American Company.    The plaintiff, under the credit which the Anglo-American Company extended to it, entered at once upon a large trade in the various kinds of meats produced by the latter company, and continued it from 1886 to December 3, 1892, when the trade between the parties ceased.    It commenced its business in Albany, had a branch at Plattsburg, and afterwards transferred the business to New York City.    The plaintiff ordered of the Anglo Company whatever meats it wanted, usually directing that they be sent direct from Chicago to the plaintiff's customers, which was done; the plaintiff in such cases receiving the invoices, and crediting the Anglo-American Company with the amount as stated therein, and the plaintiff collecting from its customers.    Some meats, however, were sent directly to the plaintiff at its various places of business, and to the cold-storage houses in Weehawken, N. J., subject to plaintiff's order.    The Anglo-American Company rendered monthly statements to the plaintiff, and drew drafts from time to time upon the plaintiff, usually upon the general account.    These drafts the plaintiff honored.    As a general rule, and until near the close of their active trade with each other, the plaintiff was usually in debt to the Anglo-American Company from $40,000 to $100,000.    Robert Fowler was the president and manager of the Anglo-American Company until his death, in 1889, when Anderson Fowler succeeded him as president and manager, and Robert Stobo, the secretary of the

Anglo-American Company, succeeded him as director of the plaintiff. Stobo acted in the interest of Anderson Fowler.

The defendant the Fowler Bros., Limited, was organized September, 1890, under the laws of Great Britain, to take over to itself the business of the Anglo-American Provision Company, and of the other like corporations and companies named in its charter. It took over to itself the Anglo-American Provision Company, its capital stock, business, and liabilities. It kept the latter company alive, and used its name in most of its business with plaintiff. The Fowler Company, Limited, upon its acquisition of the Anglo-American Provision Company, thus became the real party in interest in the business thereafter done with the plaintiff, although the name of the Anglo-American Company was often used. Mr. Anderson Fowler was the representative of both defendants, and, as the transactions to which we need to refer were often had with him without specifying which defendant he represented, we shall find it convenient often to use the word "defendant" without specifying which one. Except when the proceedings of the board of directors of the plaintiff are in question, the evidence requires us to assume that Henry Davis alone represented the plaintiff, and Anderson Fowler, after the death of his brother, Robert, in 1889, represented both defendants. Some of the plaintiff's claims arose during Robert Fowler's lifetime, and in respect to them he represented the Anglo-American Provision Company.

This case was tried together with two others involving alleged causes of action growing out of the same transactions, and involving the same defenses. We shall separately examine the various causes of action, but what we say in this case in reference to the various defenses will apply to the two other cases.

1. As to the causes of action in this case: The defendants, in their brief, apart from their general defenses of settlements, and that the goods were purchased upon Chicago inspection, contest eight of the fourteen items allowed by the referee as not established by the evidence, thus apparently leaving six items, amounting, without interest, to $2,274.13, to be tested by the other defenses. The first item contested upon its merits is for inspecting and coopering, in 1888, 803 tierces of hams and shoulders, $401.50. These tierces were sent by defendant the Anglo-American Company to the plaintiff, and stored in a warehouse in Weehawken. The plaintiff's evidence is to the effect that these goods arrived there in bad condition, and hence this work was necessary; that Robert Fowler had told him that all goods coming to Weehawken in bad condition should be made good by the defendants; that when these goods arrived Davis told Robert Fowler about their bad condition, and Fowler told him to have one Noble attend to them, pay Noble his charges, and that the defendants would repay him. Davis employed Noble. He inspected and recoopered them, rendered his bill, and plaintiff paid it. No question is made about the price. The difficulty about this item is that Davis at first seemed to be confused in his recollection, but afterwards stated that the conversation was with Robert. We do not see any ground for reversing the finding of the referee.

2. The next item is $100.56 on salted Christmas goods, being 20 crates of hams, 10,056 pounds, ordered for the Christmas trade, but which did not arrive until that trade was over, and upon which the referee allowed the plaintiff one cent per pound, being the amount of the fall in the market price upon the close of the Christmas trade. I see nothing unreasonable in this.

3. The item of $60.84 for 1,040 pounds of shrinkage in hams invoiced at 50,000 pounds, I do not think was established. It seems to be plainly due to the careful scraping and treatment they received after their arrival in order to put them in an extra nice condition, and not at all due to shortage in the invoiced weight. The claim should have been disallowed.

4. The next item challenged is for $497.25, claimed on 75 tierces of shoulders which defendant, upon plaintiff's direction, sent to plaintiff's customer Hammond, at Syracuse, which Hammond rejected as bad, and forwarded to plaintiff at New York. In a record like this, containing upward of 2,100 folios, and involving many separate items, the court must trace any one item by examining the folios cited by the respective counsel. We have done so, and do not find the evidence that these shoulders were bad. The defendant cites us to evidence tending to show that the plaintiff never paid the defendant for these goods. We are cited to no explanation of this evidence. We think the referee should have disallowed the item.

5. Plaintiff claims $2,047.40, being loss upon 300 tierces of hams, parcel of 975 tierces, which plaintiff ordered in November, 1890, for January delivery; that is, delivery to such customers or to plaintiff as plaintiff should specify. In March, 1891, of the whole order, 550 tierces remained with the defendant at Chicago awaiting plaintiff's directions for delivery. March 24, 1891, Fowler telegraphed to Davis: "Shall we ship all your product promptly,—Weehawken. We are short of room." To which Davis answered on the same date: "Confined to room. Expect be at office to-morrow. Will send list of stuff by wire. Will not do to ship all to Weehawken, as have some distributions other points." March 25th, Fowler to Davis: "Compelled to ship for want of room. Inman drawn against tunnel stock. The 7,500 shares not arrived. Shall I pay draft?" Davis to Fowler, same date: "Yes. Honor Inman's draft. Am mailing you 7,500 shares." Same date, Fowler to plaintiff: "Shipped 250 tierces, sixteens. 300 twelves, average hams, Weehawken. May we ship everything remaining here? Remit." March 26th, Davis to Fowler: "Ship one car S. P. hams, 16 average, via Lackawanna, our order, Elmira. Pickle off. Cannot afford to have everything go to Weehawken. Cause double expense." March 26th Davis wrote to Fowler: "Do not ship all hams to New York, as we prefer to have them kept in Chicago, owing to bad results on previous stuff stored there. Also a difference in freight, which is a consideration." But this letter probably was not received in Chicago before March 27th, when Fowler telegraphed to Davis: "Sixteen, average, hams, all Weehawken. Cannot change arrangements. Must have remittance and room, as arranged New York." The shipment of 550 tierces to plaintiff at Weehawken for defendant's convenience, with-

out awaiting plaintiff's orders as to customers, the plaintiff complained of to the defendant, and insisted that the defendant should bear the loss to result from it. The plaintiff disposed of 250 tierces without loss. Davis and Fowler, Davis testified, met in Albany, N. Y., in April, while the 300 tierces were yet in the storehouse at Weehawken, and told him he could not accept them, and that it was there agreed between them that Davis should dispose of them as best he could, and make a statement of the loss, and defendant would adjust and pay it. The plaintiff did dispose of 240 of the tierces at a loss, and gave testimony to the effect that 60 tierces were so bad that he could not dispose of them, and that they were a total loss. The plaintiff made a statement of the loss, repeatedly exhibited it to the defendant, but defendant never allowed it. The plaintiff claims he never received the warehouse receipts for the 60 tierces; the defendant contradicts this. The referee finds with the plaintiff. It is plain that the plaintiff bought a large invoice of goods for January shipment, and that in March following it had not given defendant any order for shipping this parcel of them, and that the defendant, acting for its own convenience, forwarded the goods to plaintiff without further awaiting plaintiff's orders. The plaintiff was thus threatened with a loss, and complained to the defendant. The plaintiff was at fault in leaving the goods with defendant so long, and the defendant was too peremptory in forwarding the goods without giving the plaintiff sufficient notice to enable it the better to protect itself. It was thus a case for compromise, and I think the parties did agree that plaintiff should dispose of the goods, and that the defendant should stand the loss, if any. There does not seem to be much question about the amount of the loss. The referee's allowance should be sustained.

6. Claim of $999.93 for damages allowed by the referee at $625 on 175 tierces of hams in 1891: The defendant shows, I think, quite clearly (brief, page 19), that the bill of particulars claiming $999.93 omits a credit for $406.80 upon account of 16 tierces of smoked hams, which credit plaintiff gives defendant in folio 2115. The balance there charged is the same as shown in plaintiff's ledger, folio 1955, and there is a mistake of 16 tierces in the footing in the bill of particulars at folio 73. The claim is that the meats were defective in quality, and plaintiff therefore had to sustain a loss upon them, which defendant promised to pay. The items of the loss seem to be taken from plaintiff's books upon general testimony that the entries thereof were known to be true when made. Relying upon such entries, the claim should be reduced $31.87.

7. The claim of $925 for interest, February 2, 1889: Defendant paid Armour & Co. $6,390.95 at the request of plaintiff, and charged plaintiff with it. Plaintiff paid the defendant the amount as charged, with other items, but afterwards, on April 30, 1889, defendant credited plaintiff $86,211.93 upon account of goods charged to plaintiff, but not sent, and by mistake included the $6,390.95 as goods charged, but not sent, and did not discover the mistake until July 28, 1891, two years and three months after the credit was given. The defendant then charged the amount back to plaintiff, with $925 interest upon it. Plaintiff's bookkeeper discovered the mistake about the time the credit was made, and made a pencil entry in plaintiff's

books indicating it.    The effect of the transaction was that for two years and three months plaintiff had the benefit of a credit of $6,390.-95 to which it was not entitled, and the defendant's drafts upon it were so much less.    Plaintiff protested against the charge for interest.    The course of business between the parties was for plaintiff to pay the amounts charged against it by defendant, and to charge back its demands for errors, and thus this item of interest stood charged to plaintiff as part of its debit to defendant, against which defendant drew, and plaintiff paid the drafts.    The credit of the $6,390.95 was not a case of money paid by mistake, but of money remaining uncollected for two years and three months by mistake of the defendant, in which the plaintiff suffered defendant to rest.    But plaintiff did pay the interest when charged with it, not by mistake, but under protest, made by letter.    The burden rests upon the plaintiff to show that in good conscience the defendant ought not to retain this interest, and we incline to the opinion that under all the circumstances it has failed to do so.    The plaintiff does not come into court with hands entirely clean in respect to this item.    The referee does not fully state the facts, but there does not appear to be any dispute about them.    I think the claim should not have been allowed.

8. The allowance of $60 for damages upon a single lot of No. 3 corn bought by the defendant for plaintiff, as its agent, is also disallowed. This was outside the usual course of business between the parties. Defendant bought it according to the rules of the Chicago Board of Trade, and simply charged a commission of $15 upon it, and offered, if plaintiff would send it samples and affidavits, to recover plaintiff's damages from the vendor.    It is true, the defendant invoiced the corn as if it were the vendor; but the evidence showed that it was merely plaintiff's purchasing agent.

The aggregate of the items disallowed is $1,574.96, to which interest is added in the judgment.    The claim of the defendant that the meats were purchased upon Chicago inspection we do not sustain, for reasons which it will be easier to present in connection with the alleged settlement between the parties June 24, 1891, at a meeting of the plaintiff's directors, now about to be considered.

The defendants claim that all the demands of the plaintiff were settled by the parties, and, as settled, satisfied.    These alleged settlements were:    (1) By the board of directors of the plaintiff, Davis participating, June 23, 24, 1891.    (2) March 11, 1892, by Davis and Anderson Fowler, when Davis gave plaintiff's note to Fowler for defendant for $27,102.21, which note was renewed by plaintiff by two notes, one dated June 25, 1892, the other June 27, 1892, each for $13,551.11, which plaintiff paid at maturity.    (3) By Davis and Anderson Fowler, December 9, 1892, when Davis gave three notes of plaintiff to Fowler for defendant, aggregating $23,546.67.    (4) By judgment obtained upon the December notes.

The importance attached by the defendant to the so-called proceedings of the plaintiff's board of directors June 24, 1891, leads us to examine respecting them, not only with respect to this action, but with respect to the other two actions.    The defendant claims that at that meeting all past differences were settled, and an adjustment made of the terms of the future dealings of the parties with each

other.    On the 23d and 24th days of June, 1891, Henry Davis, Anderson Fowler, and Robert Stobo, the three persons composing plaintiff's board of directors, did meet together in Chicago.    Fowler and Stobo were also directors of the Anglo Company, and Fowler was manager of both defendants.    The plaintiff denies that the meeting was of plaintiff's board, and alleges that it was merely a conference between Davis, as plaintiff's manager, and Fowler and Stobo in behalf of the Anglo Company; and he denies that plaintiff's claims were settled, and he challenges the verity of the record, and charges that it is a subsequent fabrication.    In 1893 the plaintiff's board was changed by electing Mr. Weed in the interest of Mr. Davis as a director in the place of Mr. Fowler, and in December, 1893, the board "reconsidered, rescinded, and annulled" the resolutions hereinafter marked "A" and "B," charging that they were a fraud upon the plaintiff.    The minutes of the meeting of June 24, 1891, were made at the time in a pencil draft by Mr. Stobo, the secretary of plaintiff's board, and afterwards, with the addition of formal parts, entered in the book of minutes of the proceedings of plaintiff's board.    After reciting time, place, and directors present, the minutes recite:

"This meeting was called for the purpose of adjusting the accounts between the Davis Provision Company and the Anglo-American Provision Company."

It thus appears that it was a meeting of the representatives of each company, although entered in plaintiff's book as a meeting of its board.    The minutes proceed:

"* * * After considerable discussion regarding the accounts and explanations of the same from Mr. Davis, it was found that it was impossible to come to an understanding that afternoon, and this meeting was on motion adjourned to Wednesday, the 24th inst., at 1:30 p. m., at the same place."

The minutes recite that the same directors met the next day pursuant to adjournment, and that—

(a) "Mr. Fowler moved that the claims by the Davis Provision Company on the Anglo-American Provision Company for allowances on old mess pork should be abandoned, seeing that it was purchased as contract pork, and was shipped just as received. Mr. Stobo seconded the motion. Mr. Davis stated that he had bought the Anglo brand of pork. Mr. Fowler said that was a mistake, as Mr. Davis had bought contract pork only, and not the Anglo brand. The motion, being put, was carried, Mr. Davis dissenting."

(b) "After consideration and discussion on the subject of the accounts and claims, it was agreed that the claims up to date are settled by the Anglo-American Provision Company allowing the Davis Provision Company $1,803.70. The Davis Provision Company sells to the Anglo-American Provision Company the 45 tierces rib bellies now in Chicago at 5½ cents per pound. The Davis Provision Company gives their acceptance to the Anglo-American Provision Company for the balance now due at thirty, sixty, and ninety days, in equal proportions."

Assuming the truth of the record, the representatives of the two companies agreed to these propositions.    The acceptances, however, were not given by the plaintiff, but defendant continued to render accounts as before.    The following entries were not "reconsidered, rescinded, or annulled" at any subsequent meeting:

"In regard to future business between the Davis Provision Company and the Anglo-American Provision Company the arrangement is as follows:

"The Davis Provision Company to get one per cent. from this date on all goods purchased by them from the Anglo-American Provision Company, or sold by them for the Anglo-American Provision Company; and to avoid further claims

and controversies it has been" "agreed, that all goods are to be inspected at the time of delivery, and that inspection is to be final."

"The Anglo-American Company agree to carry goods for the Davis Provision Company, and when the goods are ordered shipped, a draft at thirty days to be made for the invoices, with carrying charges."

"Mr. Fowler moved that with reference to the meeting of 14th April, 1890, the action therein not having been consummated, and Mr. Davis having continued to draw his salary of $5,000 per annum, as formerly, it is resolved, that Mr. Davis' salary of $5,000 be confirmed and continued until further arrangements."

"This motion, on being put to the meeting, was carried unanimously. * * *"

"On motion, duly carried, a semiannual dividend of five per cent. is declared on the capital stock of the Davis Provision Company, to be paid on the 15th day of July next."

Without herein setting forth at length the evidence, we believe the minutes state with substantial truth the result of the conference between the three persons present. With respect to the resolutions confirming Mr. Davis' salary at $5,000 per year, and declaring the semiannual dividend of 5 per cent. upon the plaintiff's capital stock, to neither of which the plaintiff objects, the minutes show the action of the plaintiff's board. In other respects the minutes on their face purport to show the transactions between the manager of the plaintiff and the managers of the Anglo Company. The proposition, of course, cannot be admitted that Fowler and Stobo, while professedly acting in the interest of the Anglo Company upon matters of difference between the two companies, could by their votes in the interest of the Anglo Company dispose of or control the opposing interest of the plaintiff against the will of Davis, who alone, in these matters, was representing and defending it. When two companies are acting at arm's length, each one acts only through its real champions, whatever the disparity between the number of persons on the respective sides. If we assume it to be, in strictness, a meeting of the plaintiff's board, then the agreements set forth between the plaintiff and the Anglo Company lack the element of mutuality necessary to their validity. Neither company could, by its ex parte action, bind the other; and in that case the statements of agreements were only propositions invalid until accepted by the other company, and such acceptance, not having been formally made by the Anglo Company, can only be inferred from such subsequent action of both companies as would indicate that the proposition was kept open by the plaintiff until finally acted upon by defendant, and thus accepted. These statements, therefore, are evidence of an agreement only in case they are construed as the acts of the two companies, or, as a proposition of the plaintiff, kept open until such action of the Anglo Company as shows its acceptance. And although the representatives of the two companies may then have agreed upon the terms of the settlement of their past differences, and upon the terms of their future dealings, either party could recede from such settlement with the assent of the other; and such assent, if given and acted upon, would constitute a substituted agreement. Davis testified that all of the plaintiff's claims were not settled at the Chicago meeting, but only those for which the sum of $1,803.70 was allowed, $1,250 of which was upon account of meats sold to plaintiff after having been damaged by fire, and the balance upon account of sundry small unremembered items;

that the balance of the accounts that were not settled there was left open for future settlement. The plaintiff's claims against the defendant, as they now appear in its bills of particulars in the three actions, amounted at that date to several thousand dollars, although, of course, the bills of particulars are not to be taken for more than their value as such. The plaintiff kept insisting upon its claims until it obtained from defendant a concession of their possible merits, and thus the claims were restored to their merits, except those embraced in the allowance of $1,803.70, for which no claim is herein made.

With reference to the Chicago inspection: August 26, 1891, two months after the directors' meeting, the Anglo-American Provision Company wrote the plaintiff as follows:

"Yours of 18th received, complaining of 75 tierces of Minnesota hams. We are sorry to inform you that we cannot do anything for you in the matter, as our understanding with your Mr. Davis was that you should have inspector here, who would inspect all your goods before leaving house. Not having done so, you take the goods on your own risk. Mr. Fowler will be in New York this week, and will no doubt see your Mr. Davis."

Mr. Davis testified that he did see Mr. Fowler a few days later, and told him that:

"We would not accept any inspector at Chicago; that, no matter what instructions he got, we must receive goods shipped to our customers in good condition, and they would accept them only when they were good; that no customers would ever accept such kind of meat. We never kept an inspector there at all."

It is proper to state that Davis testifies that he never saw these minutes, or heard them read, until 1893, after the trading relations between the parties were closed; and denied that this agreement was ever proposed or adopted. In this respect, however, Mr. Stobo contradicts him. The evidence, I think, shows that, although Davis and Fowler often wrangled over the question of the Chicago inspection, Davis never yielded in his refusal to submit to it, and that Fowler, although he did not yield the point as an entirety, did so in several cases as they arose, and by his letter of June 7, 1892, hereinafter set forth, did so as to all cases which could be shown to have merit. Mr. Davis testifies that the original understanding, which was never changed, was that defendant would furnish plaintiff "with good goods, and the best of goods." The evidence shows that if the meats left Chicago in good condition they would, in the usual course of transportation, reach their destination in that condition, when they ought to be examined; and if found, as they might be found, to need special treatment, they should of course receive it. The reasons urged by the plaintiff why it should not be bound by the Chicago inspection are cogent. The plaintiff was a provision company, and bought its meats of defendant as provisions, and not for any less important purpose. In the absence of a different understanding, the law would imply the contract that the provisions should be wholesome and merchantable. People v. Parker, 38 N. Y. 85. The success of the plaintiff's business depended upon the quality of the meats. The defendant undoubtedly extended to the plaintiff unusual credit, and in the main furnished it with good meats. It is not surprising,

in so large a business, involving skill in treatment, condition of the animals slaughtered, long distances of transportation, that occasional losses should arise.    The plaintiff's situation made it dependent in a large degree upon the defendant.    In paying defendant's bills as rendered, the plaintiff was exposed to great risk unless it could depend upon defendant's fairness in indemnifying it against loss caused by defendant's sending it damaged goods.    Whatever may have been the attitude of the parties to each other in respect to other demands or charges, we think that the referee was justified in finding that the plaintiff did not agree to be bound by the Chicago inspection, but was entitled to good meats; and that, when the defendant sent defective meats instead, it became liable for the consequent damages; and that this liability was not extinguished by plaintiff's payment of defendant's bills as rendered, in case the plaintiff made seasonable demand for the damages.

This brings us to the alleged settlement of March 11, 1892, when plaintiff gave defendant a note of $27,102.21.    At that time the plaintiff was apparently owing the defendant upward of $20,000 over and above all plaintiff's claims, good or bad, and the defendant wanted the money or plaintiff's note, and insisted upon having one or the other.    Davis insisted upon the plaintiff's claims.    There is no doubt from the evidence that Fowler was impatient about these claims, regarding some of them, at least, as frivolous, and others, such as Davis, in view of Fowler's interest and position in the plaintiff, and the way the defendant was extending credit to it, ought not to press; but he did not want to come to an open rupture with Davis, and he postponed their adjustment.    Neither did Davis wish to break with Fowler, and he, too, acquiesced in postponement.    The defendant's account showed a balance due it as of January 30, 1892, of $29,662.93.    On this the defendant had made a payment of $3,848,77.    There was a stock-yard storage item due defendant.    The exact amount of it was not at hand.    Charles S. Walker, defendant's clerk in its New York office, was present.    It was agreed that he should get the amount of this item from Chicago; that Davis should sign the note in blank, which he then did; and that Walker should fill in the blank with the balance to result from these three items.    Walker ascertained the stock-yard item to be $1,288.05, thus making the balance $27,102.21, which sum Walker inserted in the blank in the plaintiff's note.    In action No. 3, Mark Davis, as assignee of plaintiff, is granted a recovery of the amount of this stock-yard item, a recovery which we do not sustain.    In that interview Fowler also presented a claim of $4,628.90, for interest on account of plaintiff's delayed payments.    Davis objected to it.    As a general rule, the defendant did not charge plaintiff with interest.    Fowler evidently presented the demand as a convenient offset against the claims made by Davis, not intending to use it otherwise.    Defendant's counsel say, in their brief, "After a discussion, it was agreed that this interest item should be taken out for the time, and held in abeyance as against Davis' claims, which he was asserting as usual."    When the note fell due, in May following, plaintiff did not pay it.    Davis was still insisting upon his claims, and he and Fowler had an interview, and thereupon Fowler wrote him as follows:

"New York, June 7, 1892.

"Henry Davis, Esq., President Davis Provision Co., New York—Dear Sir: In reference to our interview to-day, I wish to state that every claim of the Davis Provision Company on our Anglo-American Provision Company shall be taken up, carefully considered, and, if it is shown to have any merit, the claim shall be carefully adjusted.       "Yours, truly,       Anderson Fowler, "President Anglo-American Provision Co.
"Chicago."

The plaintiff renewed the note of March 11, 1892, by giving two notes, one June 25, 1892, and one June 27, 1892, each for $13,551.11, which plaintiff paid upon their maturity, respectively, in September and October following.

In this statement I adopt the facts as stated by defendants. It is plain from these facts that plaintiff's claims were not settled by these notes, but were held in abeyance.

We next consider the alleged settlement of December 9, 1892. Plaintiff had been buying goods as usual. Defendant's account for merchandise against plaintiff, not including the interest item held in abeyance, called for a balance of $30,705.11. This balance was reduced $7,158.74 by credits allowed the plaintiff, making it $23,546.67, for which the plaintiff gave the defendant three notes, some further history of which will appear when we treat of the judgment obtained against the plaintiff. These credits were not upon account of plaintiff's "chronic" claims. One item of it—$5,071—was upon account of bad hams sent to plaintiff, and charged against it, but returned in October, 1892. An item of $1,663.70 was for extra freight charges which plaintiff claimed had been incurred because the defendant had shipped goods by rail instead of by lake, as plaintiff had directed. The final allowance of this claim was reserved for further consideration, but it does not appear that the credit was ever revoked. Another item of $146 had been included in the June notes. The other items of the credit were for storage, insurance, inspection charges, and $7.09 to correct an error. Unless we are to assume that the chronic claims were satisfied by Fowler's withdrawal of his interest charge which he presented in March previous, they still remained in abeyance. The referee has found upon conflicting evidence that the claims were not settled or prejudiced by giving the notes, for the reason that they were then expressly reserved from prejudice, and for future consideration and adjustment. Anderson Fowler was asked why he did not take a receipt when the notes were given, and answered, "Up to a certain period, we considered that account largely under the control of my brother and myself, because we were directors in the Davis Provision Company." Referring to some notes previously given, he testified, "We made him do it." Without going into the mass of details, we think the conclusion of the referee in this respect is sufficiently supported by the evidence.

With respect to the judgment: The notes given by plaintiff in December, 1892, were not paid when due, and defendant sued the plaintiff upon them. The plaintiff set up these claims in its answer. Through inadvertence, its attorneys omitted to procure the judge's order directing the issues to be tried as required by section 1778 of the Code, the action being against a corporation upon a promissory note, and therefore, when the case came on for trial, judgment was

taken against it as upon default.    Upon plaintiff's serving its notice of motion to have its default excused and opened, and its answer interposed, a stipulation was made between the parties as follows: "Motion to be denied, stay vacated, plaintiff not to issue the execution, Davis agreeing to pay the judgment in ten days, and such payment to be without prejudice to any and all claims of the Davis Company." That thereupon an order was made denying the motion to vacate the judgment, and plaintiff paid it within 10 days, and an order was thereupon entered vacating the judgment, and discontinuing the action.    This was in October, 1893, after the parties had ceased to trade with each other, and after the other alleged settlements.    Of course, under the stipulation as acted upon, the claims were not prejudiced by the judgment thus vacated upon payment.

Some exceptions are pressed upon our attention.    Davis employed Bergtheil, an accountant, who compiled from plaintiff's books one statement of plaintiff's claims in 1892 and another in 1893, and Davis delivered each of these statements to Fowler, who examined them in person and by defendant's clerks, and compared them with defendant's books, quarreled with Davis about them, and never allowed them.    They were part and parcel of the long-standing controversy.    Standing alone, they would be incompetent as plaintiff's declarations.    Standing, as they did, as the focus of contest, they showed what the contest was about, and served to explain the declarations of both parties.    The worst that can be said of them is that, when all the declarations of the parties over them were considered, they did not advance the plaintiff's case.    We do not think their admission under the circumstances constitutes reversible error.

Davis was permitted to testify to the arrangement made between him and the Fowlers preliminary to the organization of the plaintiff corporation, and that among the terms proposed by the Fowlers and accepted and relied upon by Davis was this: "They further said they would give me good goods, and the best of goods." Undoubtedly, this was considered important by the referee.    It bears upon the contention of the defendants that plaintiff was bound by the Chicago inspection of the goods, whether they proved to be good or bad, when they reached their Eastern destination. The Fowlers were the owners and managers of the defendant, and could only carry out their proposition through the defendant, and the benefit they were seeking for themselves was through the benefit to result to both corporations through the proposed method of dealing.    The proposition was not beyond their powers, and, having been acted upon by the formation of the plaintiff, fair dealing required that the defendant should observe it.    Rogers v. Land Co., 134 N. Y. 197, 211, 32 N. E. 27; Cook, Stock. & S. p. 1043, § 707.    We think the evidence competent.

The judgment is against both defendants upon the claims accruing after the formation of the defendant Fowler Bros., Limited.    This company was formed, as its charter recites, "to acquire and to take over all or any of the following businesses," of which the business of the Anglo-American Provision Company was one.    The practical construction given these powers is shown by the facts that Fowler Bros., Limited, acquired most of the stock of the Anglo Company and its business.    The business was carried on from the same of-

fices by Anderson Fowler, manager of both companies, sometimes in the name of one company and sometimes in the name of the other. Whatever was done in the name of the Anglo Company was done by the Fowler Bros., Limited. The business that the Fowler Bros., Limited, thus acquired, the Anglo Company could not retain; and hence, apart from maintaining its organization, it is not perceived that the Anglo Company could do any business except to lend its name and credit and nominal instrumentality to the continuance of the business it had surrendered. The referee finds that the business with the plaintiff continued to be done in the name of the Anglo Company. This finding is supported by the evidence. We need not inquire very closely into the processes by which one corporation absorbs or "takes over" another without effacing its identity. It suffices, for the purposes of this action, to hold upon elementary principles the absorbing company liable for the acts of its agent, and the agent liable because it insists that it is still doing business as principal. If it is necessary to find that the two corporations acted jointly in order to support the judgment, we think the evidence would justify such a finding, since manifestly one of the purposes of such a corporate union was to promote by their co-operative or united action the corporate business upon which the prosperity of each company depended. We do not think that either company should escape liability, and do think that neither can complain because its liability is shared by the other. Their relations to each other can be settled by the one person who is the manager of both.

The defendants objected in limine that the court had no jurisdiction of the subject-matter of the action, because all the parties are foreign corporations. The plaintiff and the Fowler Bros., Limited, had severally obtained, pursuant to sections 15, 16, of the general corporation law (chapter 687, Laws 1892), the certificate of the secretary of state authorizing each to do business within this state, and each one had a place of business within the state. The Anglo-American Provision Company also had the same office in this state as the Fowler Bros., Limited. The plaintiff therefore could sue in like manner as a domestic corporation. So far as the action is upon contracts made in this state, the certificate, under section 15 of the general corporation law, authorized it to sue the defendants, and section 1780, Code Civ. Proc., confers the right. Section 1780 further subjects a foreign corporation to suit where the cause of action arose within this state, other than that affecting title to lands without the state. The complaint alleges the causes of action as arising within the state, and no issue is made by the answers in this respect. The referee finds that they did so arise. We think the objection not tenable.

It follows that the separate judgment against the Anglo-American Provision Company should be affirmed, and that the judgment against the two defendants should be modified by deducting therefrom the following items of principal: $60.84 shrinkage; $497.25, Schedule D; $31.87 from $625 allowed upon Schedule E; $60 upon corn; $925 upon interest paid by plaintiff,—total, $1,574.96; with the interest therein added upon such items,—and, as so modified, affirmed, without costs. All concur.